STATE OF CONNECTICUT  :  Case No. 3:19mj 1655 (RMS)

:  NOV 27 2019 AM11:13
FILED-USDC-CT-NEW_HAVEN

COUNTY OF NEW HAVEN  :  FILED UNDER SEAL

## AFFIDAVIT IN SUPPORT OF COMPLAINTS, ARREST WARRANTS, AND SEARCH WARRANTS

I, Justin B. Lathrop, being duly sworn, depose and state:

### BACKGROUND OF AFFIANT

1.  I am a police officer for the City of Middletown, Connecticut, and have been a Police Officer in the State of Connecticut since October of 2011. I have received instruction relative to conducting drug investigations while attending in-service training at the Connecticut Police Academy in Meriden, Connecticut. I also receive periodic in-service training relative to conducting drug investigations.

2.  I am currently a deputized Task Force Officer ("TFO") with the Drug Enforcement Administration ("DEA") and have been assigned to the New Haven District Office ("NHDO") since November of 2017. In this position, my duties include investigating violations of the Connecticut General Statutes and the Controlled Substances Act, 21 U.S.C. 801, *et seq.*, including but not limited to investigating drug traffickers and organizations responsible for the unlawful distribution of controlled substances within the State of Connecticut. As a TFO, I am a federal law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7) in that I am empowered to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

3.  I submit this affidavit in support of the following: (1) criminal complaints authorizing the arrests of Derrick L. STOKES and Rayshon J. FRAZIER for conspiracy to possess with intent to distribute and to distribute 28 grams or more of cocaine base, in violation of 21

U.S.C. § 846, and possession with intent to distribute, and distribution of, cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(iii) ("Subject Offenses"); and (2) search warrants authorizing the searches of (a) 9 Harris Circle Apartment 1-D Waterbury, CT, ("Target Premises 1"); (b) 102 Rogers Road, Middletown, CT, 06457 ("Target Premises 2"); and (c) a blue 2006 Acura TSX with Connecticut registration AC63470 ("Target Car"), all as described further in Attachment A, which is incorporated herein by reference.

4.      Based on the information set forth in this affidavit, I believe there is probable cause to believe that STOKES and FRAZIER have engaged in a conspiracy to possess and distribute crack cocaine, and that each has possessed with intent to distributed and distributed cocaine, in violation of federal law, and that instrumentalities, fruits, and evidence of those violations will be found at Target Premises 1 and 2 and in the Target Car.

## BACKGROUND ON DRUG TRAFFICKING ORGANIZATIONS

5.      In my experience as a police officer and a TFO, I have written and executed search warrants that have resulted in the seizure of illegal drugs and evidence of drug violations. Also, I have executed seizure warrants that have resulted in the seizure of assets acquired with drug proceeds and assets utilized to facilitate drug dealing activities. During my law enforcement career, I have participated in numerous investigations involving those suspected of distributing illegal drugs, coordinated controlled purchases of illegal drugs utilizing confidential sources and undercover law enforcement officers, and written, obtained and coordinated the execution of search and arrest warrants pertaining to those involved in the distribution of illegal drugs. I have testified before a grand jury and spoken with informants as well as other local, state and federal law enforcement officers regarding the manner in which drug distributors obtain, finance, store, manufacture, transport and distribute their

illegal drugs. I have prepared numerous affidavits in support of applications for search and arrest warrants that have resulted in courts issuing orders that have led to the conviction of numerous defendants for violations of state and federal narcotics laws.  Based upon my experience and training, I am familiar with the manner and means employed by narcotics traffickers, including the manner and means by which narcotics traffickers communicate, as well as the devices commonly utilized by the narcotics traffickers, and those methods employed by narcotics traffickers in an effort to avoid detection by law enforcement.

6.  During my tenure as a law enforcement officer, I have been involved with or have learned about drug traffickers using residences and vehicles as "mills" where drugs are processed and packaged for re-distribution; using "stash houses" as storage locations for controlled substances; using locations as points of distribution for controlled substances; using safe deposit boxes to store proceeds from drug trafficking and other items; and using businesses and offices as fronts to legitimize their unlawful drug trafficking.

7.  I know that searches of the various types of locations mentioned above have yielded various controlled substances and residue of controlled substances; drug paraphernalia; books and records reflecting drug sales, the transfer and transportation of drugs, and amounts of monies owed for drugs; records reflecting the names, addresses and telephone numbers of co-conspirators; sales receipts, travel records and other records reflecting the expenditure of monies that are proceeds from unlawful drug distribution; currency and money wrappers; records of bank transactions made to conceal and launder drug trafficking proceeds; cellular telephones; and various valuable assets such as property and automobiles that were purchased with the proceeds of unlawful drug trafficking.  These items, obtained by search

warrants, constituted evidence of drug violations, the acquisition of assets with drug trafficking proceeds, and the use of the assets to facilitate drug trafficking violations.

8. Based on my training, experience, and participation in this and other drug trafficking investigations, I also know that:

    a.  Drug traffickers commonly conceal within their residences and stash houses controlled substances, diluents, cutting agents, drug paraphernalia (including packaging and processing materials), cash proceeds and items of value derived from drug trafficking, cellular telephones used in furtherance of drug trafficking, firearms, financial records and documents relating to the distribution of controlled substances (including ledgers), and records and documents concerning transactions relating to transferring, storing, and spending money derived from drug trafficking;

    b.  Drug traffickers must maintain and have quick access to large amounts of U.S. currency, foreign currency, or other liquid assets in order to maintain and finance their ongoing drug businesses;

    c.  Drug traffickers maintain in their residences computerized or written books, records, receipts, diaries, ledgers, calendars, personal telephone/address books, cashiers' checks, money orders, and other papers relating to the transportation, ordering, sale, and distribution of controlled substances and the outstanding debts and collections from controlled substances that have been distributed;

    d.  Drug traffickers commonly provide narcotics on consignment to their customers who subsequently pay for the drugs after reselling the drugs. Therefore, the above mentioned books, records, receipts, ledgers, etc., will be secured by the drug traffickers

within their residences for ready access for the purpose of determining drug debts and collecting monies derived from the sale of drugs;

e.  Drug traffickers commonly conceal contraband, proceeds of drug transactions, records of these transactions, and records reflecting names, nicknames, addresses, and telephone numbers of current and past drug associates within their residences;

f.  Drug traffickers commonly use their residences as stash houses to store records and/or receipts reflecting the collection of drug debts and the distribution of controlled substances, as well as records and receipts reflecting the expenditure of drug proceeds for personal and business assets;

g.  Drug traffickers will attempt to legitimize the profits from illegal drug transactions by using domestic banks and their attendant services such as safe deposit boxes, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, and business fronts;

h.  Drug traffickers often have photographs or videos of themselves, their co-conspirators, and the property and assets purchased with drug proceeds.  These photographs and videos are normally in the drug trafficker's possession or residence, and are often stored on a cellular telephone;

i.  Drug traffickers commonly have firearms and other weapons in their possession, in their cars, on their persons, and at their residences and stash locations, including, but limited to handguns, rifles, shotguns, automatic weapons, and knives.  These firearms and weapons are most often kept to protect and secure drug traffickers' drugs, drug proceeds, and property;

j.   It is a common practice for drug traffickers to store their drug proceeds, drug inventory, and related drug paraphernalia in their residences, including within safes or lock-boxes or other closed container within their residences, stash locations, or cars, or in the residences or cars of their trusted associates;

k.   When controlled substances, including but not limited to heroin and cocaine, are stored within a premises or an automobile, residue of the controlled substances can remain in the storage location for months after the drugs themselves have been removed, and there exists a process pursuant to which investigators can collect as evidence residue to suspected controlled substances, and the residue can be laboratory tested to confirm, or rule out, the presence of a controlled substance in the residue; and

l.   Drug traffickers use cellular telephones to contact their sources of supply, customers and co-conspirators.

9.   Drug traffickers often have, possess, maintain, and control in their homes, garages, stash locations, out-buildings, and cars the type of items listed in Attachment B.

## INVESTIGATION BACKGROUND

10.   As part of my official duties, I am participating in an investigation of DERRICK L. STOKES and RAYSHON J. FRAZIER concerning their conspiracy to possess with intent to distribute and to distribute 28 grams or more of cocaine base, in violation of 21 U.S.C. § 846, and possession with intent to distribute, and distribution of, cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(iii), in the central Connecticut area.   Cocaine base is a Schedule II controlled substance.

11.   The facts in this affidavit are based on evidenced I gathered during the investigation, relayed to me by other law enforcement officers, and obtained from a confidential source who I have

found to be reliable based on information provided.  I have analyzed reports submitted by other DEA agents, DEA Task Force Officers (TFOs), and local law enforcement agencies. I have received location data from STOKES's cellular telephone that was obtained pursuant to a court order, analyzed telephone toll records, and reviewed video surveillance of a drug transaction between STOKES and a confidential source. I have reviewed audio/video surveillance of drug transactions between STOKES and an undercover officer as well as audio/video surveillance of drug transactions between FRAZIER and an undercover officer. I have also listened to consensually recorded telephone calls from the Connecticut Department of Correction (DOC) between STOKES and FRAZIER that show FRAZIER and STOKES are conspiring to sell narcotics together and sharing the proceeds from their narcotic sales.  I have not set forth all the facts and evidence that I have gathered during the course of this investigation.  Instead, I have set forth those facts that I believe are necessary to establish the existence of probable cause to support the requested warrants.

### THE RELEVANT FACTS

12. In the summer of 2019, acting on information gained over the course of the investigation, other law enforcement officers and I formulated plans to make a controlled purchase of cocaine base from STOKES using a DEA Confidential Source ("CS").[1]  The CS would also attempt to introduce an undercover officer ("UC") to STOKES so the UC would be able to make future cocaine base purchases from STOKES. The CS told me that he/she met STOKES several years ago and knew him to be a larger quantity crack cocaine dealer.  The CS reported that STOKES expressed an interest to him/her to establish a drug distribution

---

[1] The CS has been a DEA CS since approximately July 2019. This CS is cooperating with the DEA in exchange for monetary compensation. Information provided by the CS to controlling agents during this investigation has been corroborated through multiple surveillance operations. Accordingly, the CS is believed to be truthful, accurate and reliable.

relationship with new customers to expand his cocaine distribution business in and around Connecticut. The CS further reported that STOKES was using telephone number 404-275-5863 to facilitate his drug sales.

13.  According to a criminal history check of STOKES, he is a convicted felon with multiple arrests for the possession and distribution of narcotics in violation of state law in Connecticut. STOKES also has arrests in Connecticut for reckless endangerment, interfering/resisting, running from police, and probation violations. According to Department of Labor records, STOKES's last reported earned income is $1,230.90 in the second quarter of 2016.

Controlled Purchases from STOKES

14.  On July 19, 2019, law enforcement worked with the CS to make a controlled purchase of crack cocaine from STOKES, and to attempt to introduce a UC to STOKES as a new potential customer during the controlled purchase. During a series of unrecorded phone calls and text messages between STOKES and the CS, STOKES and the CS arranged to meet at a restaurant on Meriden Road in Middlefield, CT. The CS was searched for contraband prior to leaving for the transaction, with negative results. The CS was also provided with $1,050 in DEA Official Advanced Funds ("OAF"), with which he/she was going to purchase one ounce of crack cocaine from STOKES.

15.  The CS and the UC departed the meet location and traveled directly to the meet location chosen by STOKES while under continuous mobile and audio surveillance. The UC was operating the vehicle and the CS was in the passenger seat. Surveillance units observed STOKES arrive at the meet location in a black Acura MDX with CT registration marker AT16450, which was registered to STOKES. Surveillance units observed the UC vehicle arrive at the meet location and park next to STOKES's Acura. Agents observed the CS

emerge from the front passenger side of the UC vehicle and get into the Acura. A short time later, agents observed the CS and STOKES get out of the Acura and walk to the back of the UC vehicle. Surveillance units positively identified STOKES as the operator of the Acura SUV as he got out of the driver's side front door of the Acura and walked to the back of the UC vehicle.

16.  The CS, UC, and STOKES all met behind the UC vehicle and engaged in conversation.  The UC reported to controlling agents that STOKES provided phone number 786-877-6029 to the UC during the meeting with STOKES so the UC could contact him directly for future purchases. The UC stated the CS completed the crack cocaine purchase from STOKES while the CS was in STOKES's Acura and turned over the suspected crack cocaine to the UC once STOKES departed the area.  Once the conversation was complete, the UC and CS got into the UC vehicle and departed the area and returned to the pre-determined meet location to meet with the controlling agents.  STOKES got into the Acura MDX and departed the area.

17.  Controlling agents searched the CS and for contraband with negative results directly before and after the meeting with STOKES. Agents conducted a field test of the crack cocaine the CS received from STOKES, resulting in a positive result for the presumptive presence of cocaine base.  The suspected crack cocaine has been submitted to the DEA laboratory for analysis and results are pending.

18.  On July 25, 2019, the UC contacted STOKES at phone number 786-877-6029 and requested to buy an ounce of crack cocaine the following day.  The text messages between STOKES and the UC to arrange the transaction were preserved.  STOKES agreed and indicated he would meet the UC the following day to exchange the "same shit" (one ounce of crack cocaine) for "12," or $1,200.  On July 26, 2019, at approximately 11:30 A.M., the UC and

STOKES communicated through text messaging. In substance, they agreed to meet in approximately fifteen minutes at a location in Meriden. At approximately 11:40 A.M., members of the NHDO set up surveillance in Meriden near the meet location to cover the meet between the UC and STOKES.

19.   At approximately 11:45 A.M, controlling agents provided the UC with $1,200.00 in DEA OAF. The UC was also provided an audio recording device. Shortly after, the UC departed the pre-arranged meet location and traveled directly to an address on the Chamberlain Highway, Meriden, CT. The UC vehicle was under constant mobile and aerial surveillance. The UC vehicle arrived at the pre-arranged location at approximately 11:50 A.M and parked in the lot. At approximately 11:59 A.M., surveillance units observed STOKES's known vehicle, a black Acura MDX CT registration AT16450, with tinted windows, arrive at the main entrance for the parking lot of the pre-arranged location. Surveillance units observed the Acura pull into the parking lot and park near the UC vehicle. The UC moved the UC vehicle closer to STOKES's vehicle and surveillance units observed as STOKES emerged from the Acura MDX. STOKES entered the UC vehicle on the front passenger side. A short time later STOKES emerged from the UC vehicle, returned to his Acura, and left the area. The UC departed the area and returned to the pre-determined meet location followed by the controlling agents.

20.   Controlling agents debriefed the UC at the pre-determined meet location. The meeting was recorded via covert audio recording device by the UC. The UC confirmed that Derrick STOKES was the person who sold the UC crack cocaine. The UC said that STOKES stated he did not have enough product for one full ounce and he could only put together 22 grams of crack-cocaine. STOKES charged the UC $950.00 for the 22 grams. The UC said STOKES

reached into his right pants pocket and handed over a clear plastic bag containing a white colored rock like substance in exchange for the $950.00 in OAF.  STOKES told the UC that he would be good to go next time. A field test of the approximately 22 grams of suspected crack cocaine was completed, resulting in a positive result for the presumptive presence of cocaine base.  The suspected crack cocaine has been submitted to the DEA laboratory for analysis and results are pending.

21.   On August 1, 2019, the UC contacted STOKES at phone number 786-877-6029 and requested to buy an ounce of crack cocaine the following day. STOKES agreed and indicated he would meet the UC the following day. On August 2, 2019, beginning at approximately 8:01 A.M., STOKES and the UC engaged in text message and phone call conversation.  The phone calls and text messages between STOKES and the UC to arrange the transaction were recorded and preserved.  In substance, STOKES agreed to sell the UC one ounce of crack cocaine for $1,200 around 12:00 P.M.  At approximately 11:19 A.M., STOKES sent the UC a text message directing him to City Gas at 1439 Baldwin Street in Waterbury to conduct the transaction. At approximately 12:00 P.M., controlling agents met with the UC and provided him with an audio recording device and $1,200.00 in OAF. At approximately 12:06 P.M., the UC called STOKES and said he would arrive at City Gas in five to ten minutes.

22.   At approximately 12:15 P.M., the UC arrived at City Gas and parked. At this same time, DEA Airwing observed a blue Acura sedan bearing CT registration AC63470 (the "Target Car"), which appeared to drop off STOKES in the same parking lot. STOKES walked to the UC's car and got into the front passenger seat. The UC and STOKES then departed the parking lot, following the Acura, and parked on Baldwin Street. At approximately 12:19 P.M., DEA Airwing, along with mobile surveillance units, observed STOKES exit the UC

car and get into the front passenger seat of the Acura. The UC departed the area and traveled back to the pre-determined meet location followed by the controlling agents. The Acura made a U-turn maneuver on Baldwin Street and continued to the parking lot of a multi-family residence located at 1266/1268/1270 Baldwin Street. A spotter for DEA Airwing observed STOKES exit the Acura and walk toward the address at approximately 12:21 P.M. Mobile surveillance units observed a black Acura MDX bearing CT registration AT16450, which is known to be utilized by STOKES, parked in the driveway of 1266/1268/1270 Baldwin Street.

23. A motor vehicle inquiry showed that the Target Car is a 2006 Acura TSX registered to Talitha Hoffler-Frazier of 295 Putnam St Apt 1B, Bridgeport, CT. Hoffler-Frazier is believed to be the mother of Rayshon FRAZIER, STOKES's co-conspirator.  Prior to this controlled purchase, the CS had told the case agents that the CS had seen Rayshon FRAZIER operating a light blue Acura in the past.  Case agents believe the blue Acura sedan observed during the UC purchase on August 2 was being operated by FRAZIER.

24. At approximately 12:27 P.M., controlling agents debriefed the UC at the pre-determined meet location. The meeting was recorded via covert audio recording device by the UC.  The UC relinquished custody of the audio recording device and the suspected crack cocaine purchased from STOKES. The UC confirmed that Derrick STOKES was the person who sold the UC crack cocaine. The UC said during the meet the UC handed STOKES $1,200.00 in DEA OAF. STOKES then reached into his right pants pocket and handed the UC a clear plastic bag containing a white colored rock like substance in exchange for the DEA OAF.  A field test of the approximately 28 grams of suspected crack cocaine was completed, resulting in a positive result for the presumptive presence of cocaine base.  The suspected crack cocaine has been submitted to the DEA laboratory for analysis and results are pending.

25.   On August 26, 2019, the UC contacted STOKES at phone number 786-877-6029 and requested to buy an ounce of crack cocaine the following day. STOKES agreed and indicated he would meet the UC the following day. On August 27, 2019, beginning at approximately 11:00 A.M., STOKES and the UC engaged in text message and phone call conversation. The phone calls and text messages between STOKES and the UC to arrange the transaction were recorded. In substance, STOKES agreed to sell the UC one ounce of crack cocaine for $1,200.00. At approximately 12:40 P.M. the UC received a phone call from STOKES. In sum and substance, STOKES and the UC discussed their locations at the time and STOKES proposed a meet location in Milford to conduct the transaction. Controlling agents provided the UC with $1,200.00 in DEA OAF and an audio/video recording device. Shortly after, the UC departed the pre-arranged meet location and traveled directly to Milford, CT. The UC vehicle was under constant mobile surveillance.

26.   At approximately 1:15 P.M. members of the NHDO set up surveillance in Milford near the meet location to cover the meet between the UC and STOKES. DEA Airwing was also in use and overhead of the area to follow the UC vehicle and cover STOKES and the UC while they met. At approximately 1:20 P.M. mobile surveillance observed STOKES's known vehicle, a black Acura MDX CT registration AT16450, with tinted windows, parked in the parking lot of the Golden Corral Restaurant in Milford. Surveillance units observed as the UC vehicle entered the same parking lot and park next to STOKES's black Acura MDX. The UC emerged from his vehicle and walked over to STOKES's Acura and got into the back seat. A short time later surveillance units observed the UC get out of STOKES's Acura and return to his vehicle. The UC departed the area and returned to the pre-determined meet location, followed by controlling agents.

27.   Controlling agents debriefed the UC at the pre-determined meet location. The UC relinquished custody of the purchased suspected crack cocaine. A field test of the approximately 28 grams of suspected crack cocaine was completed, resulting in a positive result for the presumptive presence of cocaine base.  The suspected crack cocaine has been submitted to the DEA laboratory for analysis and results are pending.

28.   The UC also relinquished custody of the audio/video recording device.  The meeting was recorded via covert audio/video recording device by the UC.  The UC confirmed that Derrick STOKES was the person who sold the UC crack cocaine. The UC said during the meet in the target vehicle after brief small talk, the UC handed STOKES $1,200.00 in DEA OAF. STOKES then handed the UC a clear plastic bag containing a white/yellowish colored rock like substance in exchange for the DEA OAF. The UC, knowing that STOKES was due to report to jail for a state probation violation on September 4, 2019, asked STOKES about STOKES going to jail and STOKES said his other "boy" would take care of the UC. STOKES gave the UC a phone number of 404-971-2895 to contact once he (STOKES) went away to jail.

<u>Controlled Purchases from FRAZIER</u>

29.   Through this investigation, I learned from the CS and from another DEA TFO that Rayshon J. FRAZIER would be the one who would answer phone number 404-971-2895 and continue the sales of crack cocaine for STOKES while he was incarcerated.

30.   According to a criminal check of FRAZIER, he has multiple arrests with convictions for possession of a controlled substance, violation of a restraining order, criminal trespass, larceny, disorderly conduct, breach of peace, criminal mischief, interfering/resisting, unlawful restraint, and assault in the third degree, all violations of state law in Connecticut.

31.   On September 16, 2019, members of the NHDO formulated plans to conduct a controlled purchase of one-half (1/2) an ounce of crack cocaine from phone number 404-971-2895 utilizing the UC. The UC started a text message conversation with phone number 404-971-2895 where prices and amounts were discussed. These messages were recorded and the transaction was planned between the UC and the phone holder of 404-971-2895 to take place on September 17, 2019.  Case agents believed the UC was communicating with Rayshon FRAZIER. The UC was provided with a photograph of FRAZIER and a description of the blue Acura (Target Car) observed on a previous purchase from STOKES to confirm the identity of the phone holder of 404-971-2895 and, if possible, the operator of the Target Car.

32.   On September 17, 2019, at approximately 10:59 A.M. the UC placed a phone call to FRAZIER. The phone call between FRAZIER and the UC to arrange the transaction was recorded.  In substance, the UC and FRAZIER discussed their locations, and FRAZIER said he needed an hour or two before they meet. FRAZIER told the UC he had the product for him and wanted to meet later.  FRAZIER proposed a meet location of the Brass City Mall in Waterbury as a meet location to conduct the transaction with the UC.  They agreed on a time of around 2 hours from the call.  At approximately 12:45 P.M. members of the NHDO set up surveillance in Waterbury near the meet location to cover the meet between the UC and FRAZIER. DEA Airwing was in use and overhead of the area to follow the UC vehicle and cover FRAZIER and the UC while they met. Controlling agents provided the UC with $600.00 in DEA OAF and an audio/video recording device. Shortly after, the UC departed the pre-arranged meet location and traveled directly to the Brass City Mall in Waterbury, CT. The UC vehicle was under constant mobile surveillance. At approximately 1:20 P.M. the UC vehicle arrived at the Brass City Mall and parked in the area of the IHOP Restaurant

near the front of the mall as discussed with FRAZIER earlier. The UC vehicle was under constant surveillance by mobile units and DEA Airwing.

33.    At approximately 1:41 P.M., a surveillance unit observed FRAZIER's known vehicle, a blue Acura TSX CT registration AC63470 (Target Car) with tinted windows in the parking lot of a housing complex near the intersection of Berkley Avenue and Long Hill Road. During the course of this investigation it was learned FRAZIER's girlfriend was believed to live in one of the apartments in the housing complex. At approximately 1:46 P.M., a surveillance unit observed FRAZIER walk to the Target Car carrying a diaper bag. FRAZIER placed the baby bag in the front passenger side door of the Target Car. FRAZIER was wearing a jean jacket and jeans with matching designs, and his hair was tied in long braids. FRAZIER went back into the apartment briefly and came out with something in his hand, but the surveillance unit could not identify what he had in his hand. The surveillance unit was able observe that the apartment door through which FRAZIER entered and exited was marked 1-D.  The address FRAZIER left from was verified as 9 Harris Circle, apartment 1-D, Waterbury CT (Target Premises 1).

34.    At approximately 1:48 P.M., the surveillance unit observed FRAZIER enter the Target Car through the front driver door and leave the area. FRAZIER was the sole occupant of the Target Car. At Approximately 1:53 P.M. surveillance units observed the Target Car enter the mall parking lot near the IHOP and park next to the UC vehicle. Surveillance units observed as FRAZIER got into the front passenger seat of the UC vehicle.  A short time later surveillance units observed FRAZIER get out of the UC vehicle and return to the Target Car. The UC departed the area and returned to the pre-determined meet location followed by controlling agents.

35.   Controlling agents met with the UC at a pre-determined location. At this location the UC relinquished custody of the purchased suspected crack cocaine and custody of the audio/video recording device. The meeting was recorded via covert audio/video recording device by the UC.  Case agents debriefed the UC at the pre-determined meet location. The UC confirmed Rayshon FRAZIER was the person who sold the UC crack cocaine, based on a comparison to the photograph of FRAZIER that had been provided to the UC before the transaction.  The UC said during the meet after brief small talk, the UC handed FRAZIER $550.00 in DEA OAF. FRAZIER then handed the UC a clear plastic bag containing a white colored rock like substance in exchange for the DEA OAF. A field test of the approximately 14 grams of suspected crack cocaine was completed, resulting in a positive result for the presumptive presence of cocaine base.  The suspected crack cocaine has been submitted to the DEA laboratory for analysis and results are pending.

36.   On October 9, 2019, members of the NHDO formulated plans to conduct a controlled purchase of one-half (1/2) an ounce of crack cocaine from FRAZIER utilizing the UC. The UC contacted Rayshon FRAZIER at telephone number 404-971-2895. The communications between FRAZIER and the UC to arrange the transaction were recorded.  In substance, FRAZIER agreed to sell the UC 14 grams of crack cocaine the following day.

37.   On October 10, 2019, beginning at approximately 10:16 A.M., the UC and FRAZIER engaged in a text message conversation during which they agreed to meet at the Brass City Mall in Waterbury for the crack cocaine transaction at approximately 11:30 A.M. At approximately 11:00 A.M., controlling agents met with the UC at a pre-arranged location. The UC was provided with $550.00 in OAF and a video/audio recording device. The UC then traveled to the Brass City Mall followed by the controlling agents. Mobile surveillance

was also established throughout the mall parking lot. At approximately the same time, a surveillance unit established surveillance at FRAZIER's suspected stash location of 9 Harris Circle, Unit 1-D, in Waterbury (Target Premises 1). At this time, the surveillance unit saw FRAZIER's vehicle, a blue Acura TSX bearing CT registration AC63470 (the Target Car), parked near the intersection of Harris Circle and Berkeley Avenue. The surveillance unit captured FRAZIER leaving Target Premises 1 on video.  At approximately 11:24 A.M., the UC texted FRAZIER and advised he had arrived at the mall.  At approximately 11:26 A.M., FRAZIER texted the UC and said he was on his way.  At approximately 11:35 A.M., the surveillance unit saw FRAZIER exit the Target Premises 1 and walk toward the Target Car. At approximately 11:43 A.M., surveillance units observed the Target Car enter the rear entrance of the mall. The Target Car parked immediately adjacent to the UC vehicle. FRAZIER then exited its driver's side and got into the front passenger seat of the UC vehicle. Approximately one minute later, FRAZIER exited the UC vehicle, got back into the Target Car and departed the area. Surveillance units followed FRAZIER to the rear of the mall, where he parked, exited the Target Car, and entered the mall. Surveillance of FRAZIER was terminated at approximately 12:10 P.M.

38. Controlling agents met the UC at a pre-determined location where the UC relinquished custody of the suspected crack cocaine and the video/audio recording device. A field test of the approximately 14 grams of suspected crack cocaine was completed, resulting in a positive result for the presumptive presence of cocaine base.  The suspected crack cocaine has been submitted to the DEA laboratory for analysis and results are pending.

STOKES's Calls with FRAZIER from the Department of Correction

39. On September 4, 2019, Derrick STOKES was taken into the custody of the CT Department of Correction (CT DOC) to serve a term of 15 months for a charge of violation of probation. Following STOKES's admission to CT DOC, case agents obtained recordings of phone calls made by STOKES to FRAZIER, and others, over the prison telephone system, pursuant to DEA administrative subpoenas. Based on the content of these phone conversations, case agents believe that STOKES and FRAZIER are currently communicating over 475-775-0350 regarding the continuation of STOKES's drug trafficking business. The DOC phone log shows phone number 475-775-0350 as belonging to Yahaira Ramirez. Ramirez is the known girlfriend of Rayshon FRAZIER and one of the occupants of Target Premises 1, along with FRAZIER and a newborn child he has with Ramirez. Both FRAZIER and Ramirez have been observed by agents entering and leaving Target Premises 1 during the investigation.

40. On September 8, 2019, STOKES using the DOC phone system, called 475-775-0350. During that call STOKES says, "What's good with you?" The person I believe to be FRAZIER responds, "Where you said that was in the, in the, in the closet? At mommy's shit?" STOKES responds, "It's on the shelf, with the black, with the black tin can or whatever." FRAZIER responds, "Ok, cause I had smoked a blunt [U/I]." STOKES says, "You said what?" FRAZIER says, "I smoked and forgot where you said it was at." STOKES replies, "As soon as you go into the closet, well my closet, and just open the, just reach up on the shelf. You'll see a black tin can, just right there on the shelf." FRAZIER responds, "Alright. Yeah, I talked to her. That was the right number. I talked to her. I um…." STOKES responds, "Oh that was the number? What I said . . . 2453 or some shit right?" FRAZIER responds, "Yeah, some shit. I had wrote, I wrote it down." STOKES replies, "Oh, but that was her though?"

FRAZIER responds, "Yeah." STOKES then says, "I couldn't remember if that was the right number or not. So I was like I don't know so if it don't work ask mommy for it." FRAZIER responds, "She was like who's this? I was like Rayshon [U/I]." This call from the DOC phone system shows that Rayshon FRAZIER identifies himself while talking to STOKES using phone number 475-775-0350. The voice on the phone call also matches the voice from recorded UC buys into Rayshon FRAZIER.

41. On October 2, 2019, STOKES, using the DOC phone system, called FRAZIER at 475-775-0350. During that call, STOKES provided FRAZIER two phone numbers and also directed FRAZIER to do several tasks for him, including to drop off proceeds from narcotic sales to the person whose phone number STOKES gives FRAZIER. The conversation is as follows: FRAZIER asks STOKES, "What was the number again?" STOKES replies, "203-800-5920." FRAZIER then asks, "What was the other number?" STOKES replies, "That's um, that's Shanell's shit. So just put it in [U/I] just put an S next to it so you know who's who."

42. STOKES then says, "The next one, 860-834-2647." FRAZIER replies, "You said that was [U/I]." STOKES replies, "Yeah." FRAZIER then asks, "You said she has a shoebox over her house or something right?" STOKES replies, "It ain't no shoebox, it's a fuckin box so it's a lockbox." I know, based on my training and experience, that it is common practice for drug traffickers to store their drug proceeds, drug inventory, and related drug paraphernalia in their residences or residences of their trusted associates, including within safes or lockboxes. I thus believe that the person STOKES is referencing has a lockbox to hold items related to his drug trafficking.

43. The conversation continues with STOKES telling FRAZIER, "I'm telling you when you finish what you got to do bring it to her. You're not getting nothing from her, you're giving

her, you're giving her. That's what I'm telling you. You're giving." FRAZIER replies, " Oh, the [U/I] that you left me." STOKES interrupts and says "Every time that you do something for me go bring it to her so I know my shit is away and safe. You know what I'm saying?" FRAZIER responds, "Oh ok ok ok." In this portion of the conversation, based on my training and experience and what I have learned in the course of this investigation, I believe that STOKES is instructing FRAZIER to give the proceeds of FRAZIER's drug sales to the woman with the lockbox (later identified as Erica Rivera) so that they will be safe.

44.  FRAZIER then states, "I thought you wanted me to get something from her house." STOKES replies, "Nah, ain't nothing to get. I don't shit....everything with her, I know I won't spend. I won't be calling asking you for something cause it's already gone. You know what I'm saying? I left something over there too though, but I ain't even, I'm going to leave that shit [U/I]." FRAZIER responds, "Yeah, yeah." In this portion of the conversation, based on my training and experience and what I have learned in the course of this investigation, I believe that STOKES and FRAZIER are discussing Rivera's house (Target Premises 2, as described further below) and STOKES leaving money there when he went to jail.

45.  STOKES goes on to tell FRAZIER to pay bills, such as his business account, credit cards, and car insurance, with what he left on his stove. They also talk about how to get a visitor form filled out so FRAZIER and STOKES can talk in person at the jail. There are other recorded communications between FRAZIER and STOKES in which I believe the two are discussing how to cook and package the crack cocaine, in coded language.

<u>STOKES's Calls with 860-834-2647 from the Department of Correction</u>

46.  Case agents investigated the phone number 860-834-2647, given to FRAZIER by STOKES, and learned that it is subscribed to Erica A. Rivera. The phone carrier is Sprint Spectrum LP.

An address check for Erica Rivera provided an address of 102 Rogers Road, Middletown CT 06457 (Target Premises 2). This case agent then located a photograph of Erica A. Rivera and provided it to the CS.  The CS confirmed the identity of Erica A. Rivera and knew of her to be an associate of STOKES.[2] The CS has been to Rivera's residence (Target Premises 2) with STOKES in the past.  On that occasion, the CS observed STOKES going inside Target Premises 2, although the CS did not go inside.  The CS, STOKES, and Rivera smoked marijuana outside the residence.  The CS believes STOKES would trust Erica A. Rivera with his monetary proceeds while he is incarcerated.

47.  The number 860-834-2647 appears on STOKES's DOC call log.  Rather than associating the number with Rivera, however, the call log lists "Derrick Stokes" as the person to whom the 860-834-2647 number belongs.  I believe the number was set up without Erica Rivera's name to attempt to hide her identity and association with STOKES.  As described below, STOKES and the female talking on phone number 860-834-2647 discuss Rayshon FRAZIER ("Ray") bringing her money from FRAZIER's drug transactions, which she will hold for STOKES.

48.  For instance, on September 28, 2019, STOKES, using the DOC phone system talks to the female believed to be Erica Rivera. During that call STOKES and the female (Rivera) have the following conversation:  STOKES says "Ray going to call you. Probably um…I don't know when but…he going, he going give you some dollars." Based on my training and experience, and what I have learned in the course of this investigation, I believe that "dollars" means money earned as proceeds from FRAZIER's drug sales for STOKES's operation.

---

[2] On August 6, 2019, the investigators obtained court authorization for a pen-trap device, with precision location information, for STOKES's phone number 404-275-5863.  In June of 2019, STOKES's number contacted 860-834-2647, Erica A. Rivera's phone number, six times between June 2 and June 14.

49.   The female (Rivera) replies "ok." STOKES then says "probably like….Probably about what's there. What you got now. He probably going to give you that." Based on my training and experience, and what I have learned in the course of this investigation, I believe that when STOKES said "what you got now," he is indicating that Rivera was holding money for him at that time at Target Premises 2.  Rivera responds, " Oh..Give me." STOKES replies, "Yeah." Rivera responds "Oh. Ok." STOKES then says "I don't know when though, probably like within a month. Whenever he um…completes what he got going on over there." Rivera acknowledges and says "Un huh," to which STOKES says " Then he going to call you and…"  Rivera responds, "Ok…Well if you can tell him to text me because I ain't got my shit phone." STOKES says, "He probably will if he calls first and you don't answer then he will probably text and say who it is. Say oh this is Ray and whatever you know." Rivera responds "Yeah he has to do that."  Based on my training and experience, and what I have learned in the course of this investigation, I believe that Rivera is acknowledging that she will communicate with FRAZIER to coordinate and accept the transfer of drug proceeds from STOKES's operation at a later time.

50.   On October 1, 2019, STOKES using the DOC phone system, talks to a female on phone number 860-834-2647. Near the end of the call, STOKES mentions the name "Erica" during the conversation as they speak to each other about STOKES's weight. This conversation confirms STOKES is talking to Erica Rivera as case agents believed. On October 2, 2019, STOKES using the DOC phone system, talks to Erica Rivera on phone number 860-834-2647. The call is 16 minutes and 15 seconds long. The conversation is non-pertinent for the majority of the call, though STOKES does discuss being cousins with Erica during a conversation about family. STOKES also calls Erica by her name at one point during the

conversation.  Based on these conversations, I can conclude that Erica Rivera is using 860-834-2647.

51.     On November 2, 2019, Derrick STOKES, using the DOC phone system, talks to Erica Rivera at phone number 860-834-2647. STOKES and Rivera discuss money and mention Rayshon FRAZIER (Ray). The conversation is as follows: STOKES says, "I ain't trying to dig into that no more cause I think I spent enough what I spent with you. It's over…I'm I ain't touching that." (Rivera laughs….).  Rivera replies "Keep that safety plan right??? So when you get out you good."  Based on my training and experience, and what I have learned in the course of this investigation, I believe that this conversation is about STOKES spending some of the drug proceeds that Rivera was keeping for him at Target Premises 2, but also saving some of it at Target Premises 2 for when he is released from jail.

52.     STOKES replies "Yeah, yup I mean "I'm [U/M] either way. Between you and Ray I'm good. He told me like yo…I got a nice little piece for you when you [U/I] so you alright. And I'm like alright that's what's up." Rivera replies, "Word."  Based on my training and experience, and what I have learned in the course of this investigation, I believe that this conversation indicates that both FRAZIER and Rivera are holding drug proceeds for STOKES to access upon his release from jail.

53.     On November 3, 2019, Derrick STOKES, using the DOC phone system, talks to Erica Rivera at phone number 860-834-2647. STOKES and Rivera discuss sending money to STOKES's mother and how his mother doesn't want to take his money while he is in prison. While on the phone with STOKES, Rivera is actively in a text message conversation with STOKES's mother and STOKES is telling Rivera what to write. STOKES tells Rivera, "I'm like shit didn't stop for me… so I'm just in here. It don't stop… like I'm in here you know what I'm

saying." Based on my training and experience, and what I have learned in the course of this investigation, I believe that STOKES is explaining that even though he is in jail he is still making money running his drug trafficking organization and he has proceeds to offer to his mother. I also believe that Rivera would facilitate the transfer of money that she is holding for STOKES at Target Premises 2 to STOKES's mother if STOKES's mother responded that she needed money. Rivera then asks STOKES's mother through text if she needs money and the reply is "maybe," Rivera tells STOKES.

54. On November 24, 2019, Derrick STOKES, using the DOC phone system, talks to Erica Rivera at phone number 860-834-2647. STOKES and Rivera discuss STOKES being frustrated with who answers his calls. The conversation is as follows: Stokes says, "Shit…as long as my mama answers and you answer, I'm fine. I'll be alright, I'll make it. And then of course Ray gotta answer cause as long as I know…" Rivera laughs in between. STOKES continues, "He's ok and he's breathing and he's free and you know what I'm sayin…Then I'm happy and everything is good. Everything else I don't, I don't really care." Rivera replies, "Yeah, I feel you." STOKES says, "So it's like whatever." Rivera replies, "It be all here." STOKES then returns to talking about who he calls. I believe, based on my training and experience, the context of the conversations between STOKES and Rivera, and the context of the conversations between STOKES and FRAZIER regarding Rivera, that Rivera's statement "it be all here" is a reference to Rivera holding drug proceeds for STOKES at Target Premises 2.

55. In early November 2019, I spoke with Middletown Housing Authority about the property of 102 Rogers Road (Target Premises 2). I confirmed that this property is part of Middletown

assisted housing and the persons residing in 102 Rogers Road are Erica A. Rivera and her two juvenile children. No other residents are listed as living at that residence with Rivera.

56. On November 10, 2019, and November 26, 2019, I conducted surveillance at Target Premises 2.  I observed a vehicle that Rivera is known to operate parked at Target Premises 2 on both occasions.

57. I reviewed Rivera's toll records for 860-834-2647 and did not locate any communications between Rivera's number and the phone numbers FRAZIER has used in the course of this investigation.  However, it is possible that FRAZIER contacted Rivera using a phone number currently unknown to investigators.

<u>November 2019 Controlled Purchase from FRAZIER</u>

58. On November 14, 2019, members of the NHDO formulated plans to conduct a controlled purchase of one half (1/2) an ounce of crack cocaine from Rayshon FRAZIER utilizing a UC. The UC contacted Rayshon FRAZIER at telephone number 404-971-2895. The phone calls and/or text messages between FRAZIER and the UC to arrange the transaction were recorded.  In substance, FRAZIER agreed to sell the UC crack cocaine the following day. On November 15, 2019, beginning at approximately 2:57 P.M., the UC and FRAZIER engaged in a text message conversation during which they agreed to meet at the Brass City Mall in Waterbury for the crack cocaine transaction at approximately 3:30 P.M. At approximately 2:45 P.M., controlling agents met with the UC at a pre-arranged location. The UC was provided with $550.00 in OAF and a video/audio recording device. The UC then traveled to the Brass City Mall followed by the controlling agents. Mobile surveillance was also established throughout the mall parking lot.  At approximately the same time, a surveillance unit established surveillance at FRAZIER's suspected stash location of 9 Harris

Circle, Unit 1-D, in Waterbury (Target Premises 1). At this time, the surveillance unit saw FRAZIER's vehicle, a blue Acura TSX bearing CT registration AC63470 (Target Car), parked near the intersection of Harris Circle and Berkeley Avenue.

59.   At approximately 3:27 P.M., the UC texted FRAZIER and advised that the UC would arrive at the mall in 5 minutes. At approximately 3:28 P.M., FRAZIER texted the UC from telephone number 404-971-2895 and agreed on the meet time and location. At approximately 3:31 P.M., surveillance units observed FRAZIER exit Target Premises 1, and walk toward the Target Car. At approximately 3:33 P.M., surveillance units saw FRAZIER's vehicle (Target Car), and travel in the direction of the mall. At the same time, the DEA Airwing maintained surveillance over the Target Car as it traveled toward the mall. At approximately 3:38 P.M., surveillance units observed the Target Car enter the rear entrance of the mall. Approximately two minutes later, surveillance units observed the Target Car parked immediately adjacent to the UC vehicle. FRAZIER then exited its driver's side and got into the front passenger seat of the UC vehicle. Approximately one minute later, FRAZIER exited the vehicle and got back into the Target Car. The UC departed the area and traveled to a pre-determined meet location followed by the controlling agents.

60.   At approximately 3:44 P.M., the Airwing followed FRAZIER in the Target Car as he traveled back to the area of Target Premises 1, parked the Target Car on Berkley Avenue, and walked toward Target Premises 1. Surveillance did not observe what door FRAZIER entered at the residence. Surveillance of FRAZIER was terminated at 3:55 P.M.

61.   Controlling agents met the UC at a pre-determined location where the UC relinquished custody of the suspected crack cocaine and the video/audio recording device. A field test of the approximately 14 grams of suspected crack cocaine was completed, resulting in a positive

result for the presumptive presence of cocaine base.  The suspected crack cocaine has been submitted to the DEA laboratory for analysis and results are pending.

## CONCLUSION

62.     Based on the foregoing, there is probable cause to believe, and I do believe, that from on or about July 19, 2019, to November 15, 2019, in the District of Connecticut, STOKES and FRAZIER committed the Subject Offenses, that is, conspiracy to possess and distribute 28 grams or more of cocaine base, possession with intent to distribute, and distribution of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(iii) and 846, and that warrants should issue for their arrests.  In addition, based on the foregoing, there is probable cause to believe, and I do believe, that evidence, instrumentalities, contraband, and/or fruits of the Subject Offenses as described in Attachments B are located in the Target Premises 1 and 2 and the Target Car, and that search warrants should issue authorizing any DEA Special Agent and Task Force Officer to search the Target Premises 1 and 2 and the Target Car and seize the items described in Attachment B-1 (Target Premises 1 and Target Car) and Attachment B-2 (Target Premises 2).

_____
JUSTIN E. LATHROP
Task Force Officer, DEA

Subscribed and sworn to before me this 26th day of November, 2019, at New Haven, Connecticut.

/s/ Robert M. Spector
_____
HON. ROBERT M. SPECTOR
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

## LOCATIONS TO BE SEARCHED

a.  9 Harris Circle apartment 1-D, Waterbury, Connecticut ("Target Premises 1") is further

described as follows:  9 Harris Circle apartment 1-D is a brick style apartment building

with multiple floors. The front door is located on the ground floor of the building and is

made out of metal, brown in color, with the numerals "1-D" clearly affixed to the exterior

of the door in tan color lettering. The target door is under a set of metal stairs which leads

to the upstairs apartments.

b.  102 Rogers Road, Middletown, Connecticut (Target Premises 2") is further described as

follows: 102 Rogers Road is a two story duplex style dwelling with tan vinyl siding with

white trim. The numerals "102" are clearly marked and displayed on the residence in

black numerals along the front of the residence. There are two separate residences within

the property with separate entrances. The main entry door for 102 Rogers Road is on the

south side of the residence. The target door is white in color and is accessed through a

screen door.

c.  The Target Car is further described as a blue 2006 Acura TSX, a 4 door sedan style

vehicle with tinted windows, with VIN JH4CL968X6C006819, currently assigned

Connecticut registration AC63470, presently located in Connecticut.

## ATTACHMENT B-1

### ITEMS TO BE SEIZED FROM TARGET PREMISES 1 AND TARGET CAR

a.  Cocaine; cocaine base, residue of cocaine; and any other controlled substances or items appearing to be controlled substances;

b.  Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, including but not limited to scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, plastic bags, heat sealing devices, and diluents such as mannitol, mannite, vitamin B-12, inositol, etc.;

c.  Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances, including computerized records of same;

d.  Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances or the laundering of the proceeds thereof, including computerized records of same;

e.  Cash, currency, and records relating to controlled substances income and expenditures of money and wealth, specifically:  money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, safe deposit agreements and/or keys;

f.  Items of personal property that pertain to the identity of the person(s) within the premises, and occupancy, control, or ownership of the premises, including but not limited to cancelled mail, deeds, leases, rental agreements, photographs, video tapes, personal telephone books, diaries, utility and telephone bills, bank statements, identification documents, and keys;

g.  Cellular/digital wireless telephones, and "smart" cellular telephones and the contents thereof; electronic paging devices, speed dial telephones, electronic speed dialing devices, electronic personal organizers, caller identification memory devices as well as the telephone numbers stored within, telephone answering machines, and  telephone answering machine tapes;

i.  Safes, lock boxes and other containers in which any of the above items may be contained or concealed, as well as keys therefor and records pertaining thereto, together with the contents thereof, including any of the above items contained therein;

j.  Kitchen implements, including but not limited to pots, pans, sieves, grinders, spoons, with or without residue of cocaine.

k. Firearms.

## <u>ATTACHMENT B-2</u>

## ITEMS TO BE SEIZED FROM TARGET PREMISES 2

a.  Cash, currency, and records relating to controlled substances income and expenditures of money and wealth, specifically:  money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, safe deposit agreements and/or keys;

b.  Items of personal property that pertain to the identity of the person(s) within the premises, and occupancy, control, or ownership of the premises, including but not limited to cancelled mail, deeds, leases, rental agreements, utility and telephone bills, bank statements, identification documents, and keys;

c.  Safes, lock boxes and other containers in which any of the above items may be contained or concealed, as well as keys therefor and records pertaining thereto, together with the contents thereof, including any of the above items contained therein;